**CHEMICAL BANK NEW YORK TRUST COMPANY**
and
**Manufacturers Trust Company, Plaintiffs,**
v.
**Robert F. KENNEDY, Attorney General of the United States, Defendant.**
Civ. No. 578–61.

United States District Court
District of Columbia.
Nov. 27, 1961.

Brackley Shaw, Washington, D. C., and A. Hayne deYampert, New York City, for plaintiffs.

William H. Orrick, Jr., Asst. Atty. Gen., and Armand B. DuBois, Atty., Dept. of Justice, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This action is brought by alleged creditors of the National Bank of Hungary, against the Attorney General of the United States, to secure payment of their indebtedness out of property seized by the Attorney General under the provisions of the International Claims Settlement Act, 22 U.S.C.A. § 1631 et seq. The

matter is before the Court on cross-motions for summary judgment.

█ Certain property of the National Bank of Hungary was sequestered by the Attorney General on May 28, 1956, pursuant to the provisions of the above-mentioned statute, 22 U.S.C.A. § 1631a. In brief, this provision of law authorized the seizure of any property belonging to Bulgaria, Hungary, or Rumania, or any national of any of these countries, which had been blocked during the War years and remained blocked as of August 9, 1955. At the time of the institution of this action, the sum of $168,158.07 was available in the account of the National Bank of Hungary in the Office of Alien Property of the Department of Justice.

The statute under which the seizure had been made further provided that the property vested thereunder in the designee of the President should be equitably applied to the payment of certain debts owed by its original owner and prescribed a procedure for filing, examination, and payment of such claims. An unsuccessful claimant was accorded the right of judicial review by a civil action in the United States District Court for the District of Columbia, 22 U.S.C.A. § 1631g.

Pursuant to this statute, the plaintiffs filed claims with the Office of Alien Property of the Department of Justice, against the National Bank of Hungary, in the sums of $684,142.98 and $159,883.-04. They were based on an alleged breach of contract, whereby it is asserted that the National Bank of Hungary undertook to repay to the plaintiffs certain advances made by them or their assignors to Hungarian exporters. The claims were rejected and this suit followed. The Government contends that there was no contract as between the plaintiffs or their assignors and the National Bank of Hungary; and that even if such a contract existed, impossibility of performance due to Hungarian law excused the failure to fulfill the obligation. The questions to be determined are: first, whether the alleged contract existed; and, if so, second, whether the refusal to carry out the commitment was justified.

The following is a brief summary of the transactions, which gave rise to the alleged contract. On December 19, 1928, the New York Trust Company, the plaintiffs' predecessor and assignor, entered into a contract with eight Hungarian banks, by which the former agreed to make certain advances to enable Hungarian exporters to obtain payment in dollars for products exported from Hungary. By this agreement a self-liquidating revolving credit was created in the sum of five million dollars. The New York Trust Company on the one hand agreed to accept drafts in an aggregate sum not exceeding this amount; and on the other hand, the Hungarian banks guaranteed the payment of the drafts. A number of American Banks participated with the New York Trust Company in this project. For some time the credit was extended, drafts were accepted in this country, and repayments were made by the Hungarian banks. In Hungary, the Hungarian Commercial Bank of Pest was the conduit through which remittances were transmitted to the New York Trust Company.

On August 25, 1931, the Hungarian National Bank wrote a letter to the Hungarian Commercial Bank of Pest, by which the former undertook to receive and keep in a separate account the repayments made by exporters and to use the fund thus created to meet the drafts previously discounted by the New York Trust Company.

On December 31, 1931, however, the National Bank of Hungary discontinued the payments. The New York Trust Company protested.

The contract on which the plaintiffs rely is contained in a letter from the National Bank of Hungary to the Hungarian Commercial Bank of Pest, dated August 25, 1931. By that instrument the National Bank of Hungary agreed to discount bills of exporters as against the five million dollar credit granted by the

New York Trust Company. It was provided further that the bank was to receive repayments of advances from time to time. The letter then went on to state: "The amounts so delivered by the exporters will be kept in a separate account and will be used in the first line for payment of the bills discounted by the New York Trust Company in such a fashion that each claim will have to be legitimated by a certificate of the competent section of the Royal Hungarian Ministry of Commerce taking over the agends (sic) of the Royal Hungarian Ministry of Public Economy."

The foregoing statement clearly constituted a contractual undertaking to reimburse the New York Trust Company for the advances made by it in connection with the discounting of bills or drafts involved in this series of transactions. It is claimed in behalf of the Government that if this document constituted a contract, it was a contract with the Hungarian Commercial Bank of Pest, and not with the New York Trust Company. The plaintiffs urge, however, that the Hungarian Commercial Bank of Pest acted as agent of the New York Trust Company and, therefore, the contract was in effect made with the latter.

The plaintiffs' contention is well founded. The Hungarian Commercial Bank of Pest was the agency through which repayments were made by the National Bank of Hungary to the New York Trust Company. The Hungarian Commercial Bank of Pest acted as the agent of the New York Trust Company in receiving repayments in behalf of the latter. In fact, the National Bank of Hungary recognized the Hungarian Commercial Bank of Pest as the agent of the New York Trust Company, as appears by letter from the National Bank of Hungary to a Vice President of the New York Trust Company, of April 7, 1932, in which the writer explicitly referred to "your agent, the Commercial bank" (Transcript pp. 148–9).

In this connection, it is important to observe that although on the oral argument, Government counsel contended that the Hungarian Commercial Bank of Pest was not the agent of the New York Trust Company, they had taken the contrary position in the memorandum previously filed in connection with the pending motions. In that memorandum Government counsel refer to the above mentioned letter as having been "written by the National Bank of Hungary as National Administrator of Foreign Exchange to the Hungarian Commercial Bank of Pest in Budapest, as *agent* for the New York Trust Company." (P. 13.) The Court concludes that the Hungarian Commercial Bank of Pest acted as agent of the New York Trust Company and that, therefore, the above-mentioned letter constituted a contract between the National Bank of Hungary and the New York Trust Company.

The second objection raised in behalf of the Government is that even if a contract existed between the National Bank of Hungary and the New York Trust Company, the performance of this obligation was rendered impossible by a change in the Hungarian law contained in the so-called "Moratorium Decrees". In the light of the conclusion about to be reached, it is unnecessary to pass on the question of law whether a change in the law of a foreign country may be deemed such an impossibility of performance as will excuse failure to fulfill a contractual obligation. Irrespective of that question, the objection raised by the Government on this aspect of the litigation is untenable for a number of reasons.

First, the Hungarian law has not been sufficiently or properly proved in this proceeding. The law of a foreign country, especially a country in which the common law does not prevail, is a matter of fact and has to be proven as a fact. Such proof may be adduced either by a certified or exemplified copy of the statutes and decrees of the foreign country, or by opinions of experts, or preferably both. No proper proof of the specific provisions of the Hungarian decrees, to which the Government referred, has been introduced and consequently the Court may not take notice of them.

Second, and what is more important, in repudiating its obligation and in notifying the Hungarian Commercial Bank of Pest, by letter of January 20, 1932, that it would discontinue further payments, the National Bank of Hungary did not rely on any legal prohibition or impossibility, or any change in the law of Hungary. It endeavored to justify its course by a change in economic conditions. Pertinent portions of this letter read as follows:

"Answering your questions put in the matter of the exportcredit with the New York Trust Co., we beg to inform you that we are unable to place at your disposal the foreign currencies required for the interests service and for the repayment of credits granted under the Hungarian Exportcredit Agreement, as this would offend the principle of equal treatment claimed with full right by the foreign creditors interested in shortterm loans of this country and especially by the American creditors.

"In view of the principle of equal treatment and the wellknown changes in economic conditions, we are sorry to inform you to be compelled to consider as null and void our letter of August 25, 1931, by which we have consented that the amounts of the maturing drafts be applied for to us and by which we have promised to handle the foreign currencies delivered by the exporters on a special deposit-account. Thus in the future the exporters utilizing this credit will have to deliver to our institution the foreign currencies resulting from their exports and are under existing regulations prohibited to utilize the foreign currencies for the purpose of repayment of their export credits."

By letter of April 7, 1932, the National Bank of Hungary wrote to the Vice President of the New York Trust Company, in a similar vein:

"Our assumption as regards the revolving employment of the amounts repaid under the credit, which was the principal preliminary condition to our letter of August 25th, not having been realised and the conditions which prevailed in the month of August, 1931, having changed considerably as the crisis deepened, the technical procedure we promised to follow had to be considered as frustrated for objective reasons."

On June 14, 1932, the National Bank of Hungary wrote to a Vice President of the New York Trust Company along the same line:

"At the outbreak of the crisis, as you certainly are aware of, the Hungarian Government, in order to protect not only the Hungarian economic life but also the interests of the foreign creditors, was forced to take two important restrictive measures.

"One of those measures consisted in making payments in foreign exchanges subject to the authorisation of the National Bank of Hungary. The Bank exercising this competence, even regardless of regulations contained in formal Standstill agreements, had to watch that the foreign exchange reserves shall be distributed under a reasonable scheme and had to care for maintaining an equal treatment of the foreign creditors. This consideration intended to serve the solidary interests of all creditors, has been realised, up to the end of last year, by not allotting foreign exchanges but for interest payments. The more as there were no foreign exchanges reserves to meet capital repayments.

"This has been the position at the end of last year when foreign exchanges reserves became so much depleted that they were insufficient to cover even interest payments.

"The other measure obliged exporters to surrender the equivalent in foreign exchanges of their exports. It was impossible to grant

any exception to this rule as the country strongly wanted the full proceeds of exports, or else it would not have been possible to maintain, even to the extent as until the end of last year, the continuity of production and interest payments to foreign creditors.

"Those two measures as well as the foregoing had to be always considered by the Bank, already since the beginning of the restrictions."

This letter clearly indicates that the Bank had it within its power to make an exception in the matter and continue the payments, but that it felt that as a matter of policy it should not do so. Consequently any defense of impossibility of performance fails.

The Court reaches the conclusion in the light of the foregoing considerations, that a contract existed between the National Bank of Hungary and the plaintiffs' predecessors and assignors, and that the National Bank of Hungary was guilty of a breach in discontinuing performance of the agreement. Consequently, the claims of the plaintiffs against the fund held by the Attorney General are valid.

■■ In this connection it may be observed that the purpose of seizing enemy property is not confiscation. Even in an era of total war, confiscation of enemy property is not sanctioned either by international law or practice. The principal purpose of such seizures is to sequester the property in order to make it impossible for the enemy to use it against this country in time of war. A secondary objective is to secure payment of claims of the United States and its nationals arising against the foreign Government or against the original owners of seized property.

Consequently no reason is perceived for being astute to find justification for a denial of claims of American nationals against such funds. Plaintiffs' claims are valid not only as a matter of law, but as a matter of morals as well. There is no doubt that the group of American

banks extended credits to Hungarian exporters; that the National Bank of Hungary undertook to receive repayments and in turn to transmit them to the New York Trust Company; that in large part it failed to do so; and the American banks sustained large losses as a result of this repudiation.

The plaintiffs' motion for summary judgment is granted, and the defendant's motion for summary judgment is denied.